IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

RECEIVED

OCT 09 2012

U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION | Consolidated Multidistrict Action<br><br>Docket No. 11-MD-2296 (WHP)(JLC) |
| DEUTSCHE BANK TRUST COMPANY AMERICAS, in its capacity as successor indenture trustee for certain series of Senior Notes, LAW DEBENTURE TRUST COMPANY OF NEW YORK, in its capacity as successor indenture trustee for certain series of Senior Notes, and WILMINGTON TRUST COMPANY, in its capacity as successor indenture trustee for the PHONES Notes,<br><br>           PLAINTIFFS,<br><br>           -against-<br><br>ADALY OPPORTUNITY FUND TD SECURITIES, INC. C/O ADALY INVESTMENT MANAGEMENT CO.;<br><br>ADALY INVESTMENT MANAGEMENT CO.;<br><br>TD SECURITIES, INC.;<br><br>ADALY OPPORTUNITY FUND LP;<br><br>ADALY INVESTMENT MANAGEMENT CORP.;<br><br>LIGHTHOUSE PARTNERS LLC / LMA SPC OBO MAP I SEGRGTN PRTF C/O LIGHTHOUSE PARTNERS LLC;<br><br>LMA SPC FOR AND ON BEHALF OF MAP I SEGREGATED PORTFOLIO;<br><br>1IA SPX1;<br><br>STRATEGIC OPPORTUNITY BMO NESBITT BURNS C/O ADALY INVESTMENT MANAGEMENT CO.; | No. 1:11-cv-04784 (WHP)(JLC)<br><br>THIRD AMENDED COMPLAINT |

STRATEGIC OPPORTUNITY;

STRATEGIC OPPORTUNITIES FUND LTD.;

THE STRATEGIC OPPORTUNITIES MASTER
FUND LP;

BMO NESBITT BURNS, INC.;

ALEXANDRA GLOBAL MASTER FUND LTD.;

AMALGAMATED BANK;

WALKER HOUSE SPV LTD.;

AMIDA PARTNERS MASTER FUND LTD.;

AMIDA PARTNERS MASTER FUND LTD. / NON-
FLIP ACCOUNT C/O AMIDA CAPITAL
MANAGEMENT LLC;

AMIDA CAPITAL MANAGEMENT LLC;

THE LINCOLN FUND TAX ADVANTAGED LP;

ANIMA SGR S.P.A;

BPM CAPITAL TRUST;

JOHN DOE, AS TRUSTEE OF BPM CAPITAL
TRUST;

ANIMA SOCIETA DI GESTIONE C/O BPM
CAPITAL TRUST GSS LLC;

ARCHDIOCESE OF NEW YORK MASTER TRUST;

JOHN DOE, AS TRUSTEE OF ARCHDIOCESE OF
NEW YORK MASTER TRUST;

BELL ATLANTIC MASTER TRUST;

MATTHEW BENDER IV;

PHOEBE P. BENDER;

CHARLES E. HUGEL;

BINHUA MAO;

BLACKPORT CAPITAL FUND LTD.;

BMO NESBITT BURNS, INC./CDS;

BMO NESBITT BURNS TRADING CORP., S.A.;

HARVEY BOOKMAN;

SYSTEIA CAPITAL MANAGEMENT C/O AMUNDI
INVESTMENTS ADVISORS USA, INC.;

SYSTEIA CAPITAL MANAGEMENT;

AMUNDI INVESTMENTS ADVISORS USA, INC.;

HIMAN BROWN, TR UA 11/20/02 HIMAN BROWN
REVOCABLE TRUST;

HIMAN BROWN REVOCABLE TRUST;

JOHN DOE, AS SUCCESSOR TRUSTEE OF HIMAN
BROWN REVOCABLE TRUST;

MARY F. BROWN;

WILLIAM J. BROWN;

CBS MASTER TRUST;

JOHN DOE, AS TRUSTEE OF CBS MASTER
TRUST;

CEDAR GROVE CEMETERY ASSOCIATION
PERPETUAL CARE RESERVE FUND;

CEDAR GROVE CEMETERY ASSOCIATION;

CEDE & CO. C/O DEPOSITORY TRUST COMPANY;

CEDE & CO.;

DEPOSITORY TRUST COMPANY;

VILMA L CHANTILES JT TEN;

VILMA L. CHANTILES;

CIM XVI LLC;

CITADEL EQUITY FUND LTD.;

DUNDEE LEEDS MANAGEMENT SERVICES
(CAYMAN) LTD.;

CITADEL LLC (F/K/A CITADEL INVESTMENT
GROUP LLC);

CITI GOLDENTREE LTD.;

GOLDENTREE ASSET MANAGEMENT LP;

CLEARWATER INVESTMENT;

CLEARWATER INVESTMENT TRUST;

COGENT MANAGEMENT, INC.;

SS&C TECHNOLOGIES HOLDINGS, INC.;

SS&C TECHNOLOGIES, INC.;

COMMERZ MARKETS LLC;

CONSOLIDATED EDISON OF NY K801;

CONVERTIBLES STRATEGIC HOLD;

COUGAR TRADING LLC;

CREDIT AGRICOLE SECURITIES (USA), INC.;

D. E. SHAW VALENCE PORTFOLIO LLC;

DBSO SECURITIES LTD.;

IMPERIUM INSURANCE COMPANY (F/K/A DELOS
INSURANCE COMPANY);

DEPFA BANK, PLC (HYPO REAL ESTATE BANK INT'L);

DEPFA BANK, PLC;

HYPO REAL ESTATE BANK INT'L;

DEPOSITORY TRUST & CLEARING CORPORATION;

DEXIA BANK C/O DEXIA CREDIT LOCAL, NEW YORK BRANCH;

DEXIA CREDIT LOCAL, NEW YORK BRANCH;

DELAWARE CHARTER G&T TTEE;

DELAWARE CHARTER GUARANTEE & TRUST CO.;

DR. DAVID L. HOEXTER;

DRAWBRIDGE GLOBAL MACRO MASTER FUND LTD.;

DRESDNER BANK, AG;

COMMERZBANK AG;

DREYFUS S&P 500 STOCK INDEX FUND;

DREYFUS STOCK INDEX FUNDS, INC.;

DYNAMIC DOMESTIC FUND LP;

E*TRADE CLEARING LLC;

EAC PARTNERS MASTER FUND LTD.;

EAC MANAGEMENT LP;

ELIZABETH H. VANMERKENSTEIJN;

EMANUEL E. GEDULD 2005 FAMILY TRUST;

JOHN DOE, AS TRUSTEE OF EMANUEL E.
GEDULD 2005 FAMILY TRUST;

BOARD OF TRUSTEES OF EMPIRE STATE
CARPENTERS PENSION FUND, AS
ADMINISTRATOR OF EMPIRE STATE
CARPENTERS PENSION FUND;

EQUITY LEAGUE PENSION TRUST FUND;

JOHN DOE, AS TRUSTEE OF EQUITY LEAGUE
PENSION TRUST FUND;

KURT ADLER ESTATE;

JOHN DOE, AS BENEFICIARY AND/OR
DISTRIBUTEE OF KURT ADLER ESTATE;

EVERGREEN ASSET MANAGEMENT C/O
PRENTICE-HALL CORPORATION SYSTEM, INC.;

EVERGREEN ASSET MANAGEMENT CORP.;

FAIRWEATHER LTD PTRSHP R1F3154C,
CUSTODIAN;

DR. PETER FAIRWEATHER;

FAIRWEATHER FAMILY LP;

FAIRWEATHER LIMITED PARTNERSHIP;

FIDEURAM BANK LUXEMBOURG S.A. C/O
INTESA SANPAOLO;

FIDEURAM BANK LUXEMBOURG S.A.;

JESSE FIERSTEIN;

JESSE FIERSTEIN GEN PAR;

BRAM FIERSTEIN;

BRAM FIERSTEIN GEN PAR;

IAN FIERSTEIN;

IAN FIERSTEIN GEN PAR;

MICAH FIERSTEIN;

MICAH FIERSTEIN GEN PAR;

FIRST INVESTORS LIFE SERIES FUND BLUE CHIP
SERIES;

BLUE CHIP FUND, A SERIES OF FIRST
INVESTORS LIFE SERIES FUNDS;

FIRST INVESTORS LIFE SERIES FUND UTILITIES
SERIES;

VALUE FUND, A SERIES OF FIRST INVESTORS
LIFE SERIES FUNDS;

FIRST INVESTORS UTILITIES INCOME;

VALUE FUND, A SERIES OF FIRST INVESTORS
EQUITY FUNDS;

THE MERGER FUND;

FLEXIBLE US EQUITY MANAGERS;

PORTFOLIO 1 OFFSHORE MASTER LP LSV;

FLEXIBLE US EQUITY MANAGERS PORTFOLIO 1
LLC;

FOLKSAMERICA REINSURANCE COMPANY;

WHITE MOUNTAINS RE BERMUDA LTD.;

WHITE MOUNTAINS REINSURANCE COMPANY
OF AMERICA;

FORDHAM UNIVERSITY;

GABELLI ASSET MANAGEMENT COMPANY;

GABELLI & COMPANY, INC.;

GABELLI AVERAGE PRICE 2;

GABELLI FUNDS, INC. (THE GABELLI EQUITY INC FD) BRUCE M. ALPERT;

GGCP, INC. (F/K/A GABELLI FUNDS, INC.);

THE GABELLI EQUITY, INC. FUND;

GABELLI FUNDS, INC. (GABELLI) BRUCE M. ALPERT;

GABELLI FUNDS, INC. (THE GABELLI GLOBAL MULTIMED TR) BRUCE M. ALPERT;

THE GABELLI GLOBAL MULTIMEDIA TRUST, INC.;

GABELLI FUNDS, INC. (GABELLI FUNDS, INC.) BRUCE M. ALPERT;

GABELLI FUNDS, INC. (THE GABELLI ASSET FUND) BRUCE M. ALPERT;

THE GABELLI ASSET FUND;

GABELLI FUNDS, INC. (GABELLI ABC FUND);

GABELLI ABC FUND;

GABELLI INVESTOR FUNDS, INC.;

GDK, INC. C/O CAXTON ASSOCIATES LP;

GDK, INC.;

CAXTON ASSOCIATES LP;

GMIMCO TRUST (GENERAL MOTORS) BRUCE MARQUAND;

GMIMCO TRUST (GENERAL MOTORS INVESTMENT MANAGEMENT CORP.);

JOHN DOE, AS TRUSTEE OF GENERAL MOTORS
HOURLY-RATE EMPLOYEE PENSION TRUST
(GMHREP TRUST);

GENERAL MOTORS HOURLY-RATE EMPLOYEE
PENSION TRUST (GMHREP TRUST);

GENERAL MOTORS INVESTMENT
MANAGEMENT CORP.;

GOLDENTREE MASTER FUND II LTD.;

GOLDENTREE MASTER FUND LTD.;

GOLDENTREE MULTISTRATEGY OFFSHORE
FUND;

GOLDENTREE MULTISTRATEGY LTD.;

GOVERNMENT OF SINGAPORE INVESTMENT
CORPORATION PTE LTD.;

RUTH GRUENTHAL;

EMANUEL GRUSS;

GRYPHON HIDDEN VALUES VIII LTD.;

HAVENS PARTNERS ENHANCED FUND LP;

HAVENS PARTNERS LP;

HELEN BUTTENWIESER TRUST 7/28/38;

LAWRENCE B. BUTTENWIESER, ESQ., AS
TRUSTEE OF THE HELEN BUTTENWIESER
TRUST 7/28/38;

HOMELAND INSURANCE COMPANY OF NEW
YORK;

LENOX HILL HOSPITAL;

POLLY H. HOWELLS;

HUDSON BAY FUND LP;

HUDSON BAY MASTER FUND LTD.;

IBEW LOCAL 25 MASTERTRUST PLANS;

JOHN DOE, AS ADMINISTRATOR OF IBEW
LOCAL 25 RETIREMENT FUNDS MASTER TRUST;

INSTITUTIONAL BENCHMARKS SERIES
(MASTER FEEDER) LIMITED C/O LYRA CAPITAL
LLC;

LYRA CAPITAL LLC;

INSTITUTIONAL BENCHMARKS SERIES
(MASTER FEEDER) LIMITED;

IOLAIRE INVESTORS LLP C/O ASB ADVISORS
LLC;

IOLAIRE INVESTORS LLP;

ITG, INC.;

JEFFERIES & COMPANY, INC.;

JONATHAN A. KNEE;

MARGARET T.M. JONES CP & CO. AC;

CHARLES PRATT & COMPANY LLC;

MARGARET T.M. JONES;

JOHN DOE, AS OWNER OF MARGARET T.M.
JONES CP & CO. AC;

BARRY DAVID KUPFERBERG & LORI BANNER
KUPFERBERG JT TEN;

BARRY DAVID KUPFERBERG;

LORI BANNER KUPFERBERG;

L3 COMMUNICATIONS CORPORATION MASTER
TRUST;

JOHN DOE, AS TRUSTEE OF L3
COMMUNICATIONS CORPORATION MASTER
TRUST;

ROBERT E. LABLANC;

LABRANCHE & CO. LLC;

LABRANCHE STRUCTURED PRODUCTS LLC;

LEGG MASON PARTNERS;

LEGG MASON BATTERYMARCH FINANCIAL
MANAGEMENT S&P 500 INDEX FUND, A SERIES
OF THE LEGG MASON PARTNERS EQUITY
TRUST;

FREDRIC LEVENSON AND DOROTHY A.
LEVENSON;

FREDRIC LEVENSON;

DOROTHY A. LEVENSON;

NANCY G. LEZETTE ESTATE;

JOHN DOE, AS BENEFICIARY AND/OR
DISTRIBUTEE OF NANCY G. LEZETTE ESTATE;

THOMAS LEZETTE, AS EXECUTOR OF THE
NANCY LEZETTE ESTATE;

LOCAL 102 PENSION/NO TR VAL IM;

BAKERY CONF TOB WRKS LOCAL 102;

JOHN DOE, AS ADMINISTRATOR OF BAKERY,
CONFECTIONERY, TOBACCO WORKERS &
GRAIN MILLERS INTERNATIONAL PENSION
FUND;

BAKERY, CONFECTIONERY, TOBACCO
WORKERS & GRAIN MILLERS UNION LOCAL
102;

BAKERY, CONFECTIONERY, TOBACCO
WORKERS & GRAIN MILLERS INTERNATIONAL
PENSION FUND;

LOEB ARBITRAGE MANAGEMENT LP;

MICHAEL LOEB;

THOMAS J. MAJORANA;

STATE STREET BANK & TRUST COMPANY;

M&T BANK (F/K/A MANUFACTURERS &
TRADERS TRUST CO.);

JEROME & MARIA MARKOWITZ JTWROS;

JEROME MARKOWITZ;

MARIA MARKOWITZ;

MITSUBISHI UFJ ASSET MGMT #XX8364
(THROUGH MASTER TRUST BANK OF JAPAN)
C/O BANK OF TOKYO-MITSUBISHI UFJ TRUST
COMPANY;

MASTER TRUST BANK OF JAPAN LTD.;

BANK OF TOKYO-MITSUBISHI UFJ TRUST
COMPANY;

MITSUBISHI UFJ ASSET MANAGEMENT LTD.;

SOCIETE GENERALE ASSET MGMT CO
(THROUGH MASTER TRUST BANK OF JAPAN);

SOCIETE GENERAL ASSET MANAGEMENT CO.;

ERNEST W. MICHEL;

MILLENCO LLC;

MITSUBISHI UFJ;

MIZUHO TRUST & BANKING CO. (USA);

ALEXANDER SOLON IRRA FBO ALEXANDER
SOLON C/O MLPF&S CUST FPO;

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED;

ALEXANDER SOLON;

MONETARY AUTHORITY OF SINGAPORE;

MULTI-STRATEGY GREENOCK MASTER FUND
LTD.;

GREENOCK MULTI-STRATEGY MASTER FUND
LTD.;

NATIXIS SECURITIES AMERICAS LLC
(SUCCESSOR-IN-INTEREST TO NATIXIS
BLEICHROEDER LLC);

NEUBERGER BERMAN, INC.;

NOMURA SECURITIES INTERNATIONAL, INC.;

ASB ADVISORS LLC;

NEW EAGLE HOLDINGS LLC;

NEW YORK CITY DEFERRED COMPENSATION
PLAN;

NEW YORK STATE TEACHERS' RETIREMENT
SYSTEM;

NEWEDGE USA LLC EQUITY CLEARING
DIVISION;

NEWEDGE USA LLC;

NYC DISTRICT COUNCIL CARPENTERS
PENSION;

NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS PENSION FUND;

JOHN DOE, AS ADMINISTRATOR OF NEW YORK
CITY DISTRICT COUNCIL OF CARPENTERS
PENSION FUND;

NYC DISTRICT COUNCIL CARPENTERS
WELFARE;

NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS WELFARE FUND;

JOHN DOE, AS ADMINISTRATOR OF NEW YORK
CITY DISTRICT COUNCIL OF CARPENTERS
WELFARE FUND;

MADISON SQUARE LARGE-CAP ENHANCED
INDEX FUND LP (F/K/A NYLIM LARGE-CAP
ENHANCED INDEX FUND LP A/K/A NYLIM–QS
LARGE CAP ENHANCED FUND LP);

MARY JANE F. MOELLER, AS TRUSTEE OF THE
MARY JANE F. MOELLER TRUST U/A/D 8/7/2006;

MARY JANE F. MOELLER TRUST U/A/D 8/7/2006;

TRAITS OMNI;

PACIFIC SELECT;

PACIFIC SELECT FUND;

PAUL PAI & HELENA PAI JOINT TENANT;

PAUL PAI;

HELENA PAI;

MR VIOLET AND MRS LESLIE PAYNE JTWROS;

VIOLET PAYNE;

LESLIE PAYNE;

SUMITOMO MITSUI TRUST BANK, LIMITED
(F/K/A SUMITOMO TRUST & BANKING CO. LTD.),
AS TRUSTEE OF PENSION COMMINGLE FUND;

PENSION COMMINGLE FUND;

PENSION FUND ASSOCIATION FOR LOCAL
GOVERNMENT OFFICIALS;

SUMITOMO MITSUI TRUST BANK, LIMITED
(F/K/A SUMITOMO TRUST & BANKING CO. LTD.);

PENSION TRUST FUND LOCAL UNION #27;

POND VIEW CREDIT (MASTER) LP;

MARTHA P. POPE;

MARTHA P. POPE, AS EXECUTRIX FOR THE
ESTATE OF LEAVITT J. POPE;

LEAVITT J. POPE ESTATE;

JOHN DOE, AS BENEFICIARY AND/OR
DISTRIBUTEE OF LEAVITT J. POPE ESTATE;

CITIGROUP SECURITIES SERVICES, INC.;

PUTNAM LOVELL NBF SECURITIES, INC.;

QVT FUND LP;

R.E. GINNA NUCLEAR POWER PLANT LLC
MASTER DECOMMISSIONING TRUST;

JOHN DOE, AS TRUSTEE FOR R.E. GINNA
NUCLEAR POWER PLANT LLC MASTER
DECOMMISSIONING TRUST;

R.E. GINNA NUCLEAR POWER PLANT LLC;

R.E. GINNA QUALIFIED DECOMMISSIONING
TRUST;

JOHN DOE, AS TRUSTEE FOR R.E. GINNA
QUALIFIED DECOMMISSIONING TRUST;

RIEF RMP LLC C/O RENAISSANCE
TECHNOLOGIES LLC;

RIEF RMP LLC;

RENAISSANCE TECHNOLOGIES LLC;

RIEF TRADING LLC C/O RENAISSANCE
TECHNOLOGIES LLC;

RIEF TRADING LLC;

RISK FACIL 99: CLOSE/RISK;

GERALDO RIVERA;

STERNE AGEE & LEACH, INC.;

ROBECO INSTITUTIONAL ASSET MANAGEMENT
BV;

ROBECO INVESTMENT MANAGEMENT, INC.;

ROYAL TRUST CORPORATION OF CANADA C/O
ROYAL BANK OF CANADA;

ROYAL BANK OF CANADA;

ROYAL TRUST CORPORATION OF CANADA;

SANDELMAN PARTNERS MULTI-STRATEGY
MASTER FUND LTD.;

SCHULTZE ASSET MANAGEMENT LLC;

ARROW DISTRESSED SECURITIES FUND;

SG AMERICAS SECURITIES LLC;

ROBERT A. AND JAMIE A. SIMINS JTWROS;

ROBERT A. SIMINS;

JAMIE A. SIMINS;


ALEXANDER D. AND PAULA SOLON JTWROS;

ALEXANDER D. SOLON;

PAULA SOLON;

SHIRLEY J SPERLING AND SUSAN J MARTIN JT
TEN;

SHIRLEY J. SPERLING;

SUSAN J. MARTIN;

SPX PRINCIPAL STRATEGY U.S. SHARES
PROGRAMS;

U.S. SHARES PROGRAMS;

STICHTING PENSIOENFONDS ABP;

ABP;

APG ASSET MANAGEMENT US, INC. (F/K/A ABP
INVESTMENTS US, INC.);

STICHTING PENSIOENFONDS HOOGOVENS;

STICHTING PENSIOENFONDS OCE;

STICHTING PENSIOENFONDS VAN DE ABN
AMRO N.V.;

STICHTING PENSIOENFONDS ZORG EN
WELZIJN;

STRATEGIC FUNDS, INC.;

DREYFUS ACTIVE MIDCAP FUND;

SWAPS, SBI;

SWISS AMERICAN SECURITIES, INC.;

T. ROWE PRICE ASSOCIATES, INC.;

T. ROWE PRICE BALANCED FUND, INC.;

T. ROWE PRICE EQUITY INCOME TRUST C/O T.
ROWE PRICE ASSOCIATES, INC.;

JOHN DOE, AS TRUSTEE FOR T. ROWE PRICE
EQUITY INCOME TRUST;

T. ROWE PRICE EQUITY INCOME TRUST;

T. ROWE PRICE ASSOCIATES, INC. (TASKFORCE
& CO.);

TASKFORCE & CO.;

T. ROWE PRICE EQUITY INCOME FUND;

T. ROWE PRICE MID-CAP VALUE FUND, INC.;

T. ROWE PRICE ASSOCIATES, INC. (FOULARD &
CO.);

FOULARD & CO.;

T. ROWE PRICE EQUITY SERIES, INC.;

T. ROWE PRICE ASSOCIATES, INC. (CHEETAH &
CO.);

CHEETAH & CO.;

T. ROWE PRICE ASSOCIATES, INC. (SHERBET &
CO.);

SHERBET & CO.;

T. ROWE PRICE ASSOCIATES (SPINNINGROD &
CO);

SPINNINGROD & CO.;

W. MILTON JR. TRUST UNDER WILL FOR THE
BENEFIT OF ANNA LIVINGSTONE;

M&T BANK, AS TRUSTEE OF THE W. MILTON JR.
TRUST UNDER WILL FOR THE BENEFIT OF
ANNA LIVINGSTONE;

ANNA LIVINGSTONE;

TD EMERALD HEDGED U.S. EQUITY C/O TD
ASSET MANAGEMENT USA, INC.;

TD EMERALD HEDGED U.S. EQUITY;

TD EMERALD HEDGED U.S. EQUITY POOLED
FUND TRUST;

JOHN DOE, AS TRUSTEE OF TD EMERALD
HEDGED U.S. EQUITY POOLED FUND TRUST;

TD EMERALD POOLED U.S. FUND C/O TD ASSET
MANAGEMENT USA, INC.;

TD EMERALD POOLED U.S. FUND;

TD EMERALD U.S. MARKET INDEX FUND C/O TD
ASSET MANAGEMENT USA, INC.;

TD EMERALD U.S. MARKET INDEX FUND;

TD SECURITIES S&P 500 INDEX FUND;

TD U.S. LARGE CAP VALUE FUND C/O TD ASSET
MANAGEMENT USA, INC.;

TD U.S. LARGE CAP VALUE FUND;

TD U.S. INDEX FUND C/O TD ASSET
MANAGEMENT USA, INC.;

TD U.S. INDEX FUND;

UNIVERSITY OF TORONTO MASTER TRUST;

GOVERNING COUNCIL OF THE UNIVERSITY OF
TORONTO;

DREYFUS/LAUREL FUNDS, INC.;

DREYFUS BASIC S&P 500 STOCK INDEX FUND;

GABELLI EQUITY TRUST, INC.;

THE GDL FUND (F/K/A GABELLI GLOBAL DEAL
FUND);

GABELLI VALUE FUND, INC.;

TMS/ITS SETTLEMENT ACCOUNT FOR HFF I
LLC;

HFF I LLC;

JOHN DOE, AS OWNER OF TMS/ITS SETTLEMENT
ACCOUNT FOR HFF I LLC;

PARIS TRADING;

TRE PENSION EFT ACCOUNT PENSION
PAYMENT SYSTEM;

JOHN DOE, AS ADMINISTRATOR OF TRE
PENSION EFT ACCOUNT PENSION PAYMENT
SYSTEM;

ROBERT M. TREBOUX;

TRINITY DERIVATIVES GROUP LLC;

T ROWE PRICE TRUST CO, TRPTC TTEE
INTERSIL EQUITY INC FUND;

T. ROWE PRICE TRUST CO.;

INTERSIL EQUITY, INC. FUND;

INTERSIL EQUITY INCOME FUND;

WILLIAM SANDERSON TWADDELL;

UNITED CHURCH OF CHRIST, DEFINED
CONTRIBUTION;

THE PENSION BOARDS - UNITED CHURCH OF
CHRIST, INC.;

US TRUST CO., N.A.;

VALUE LINE, INC.;

VALUE LINE INCOME & GROWTH FUND (F/K/A VALUE LINE INCOME FUND);

VALUE LINE ASSET MANAGEMENT;

JOHN J. AND ROSEMARY WAGNER JTWROS;

ROSEMARY WAGNER;

ABIGAIL WALLACH;

ERIC D. WERTHMAN;

JESSE WERTHMAN;

CARA LEIGH GILLESPIE-WILSON;

SWISS RE FINANCIAL PRODUCTS CORP.;

TOCQUEVILLE ASSET MANAGEMENT LP;

TRIBUNE CO COM STK TENDER EXP, TENSOR OPPORTUNITY LIMITED C/O M. SAFRA & CO., INC.;

TENSOR OPPORTUNITY LIMITED;

M. SAFRA & CO., INC.;

ABN AMRO CLEARING CHICAGO LLC (F/K/A FORTIS CLEARING AMERICAS LLC);

FORTIS CLEARING AMERICAS LLC 695;

GABELLI FOUNDATION, INC.;

GAMCO INVESTORS, INC.;

GABELLI FUNDS LLC;

GABELLI SECURITIES, INC.;

GAMCO ASSET MANAGEMENT, INC.;

MARIO J. GABELLI;

T. ROWE PRICE BALANCED FUND - LARGE CAP
CORE FUND, INC.;

T. ROWE PRICE EQUITY INDEX 500 FUND;

T. ROWE PRICE INDEX TRUST, INC.;

T. ROWE PRICE TOTAL EQUITY MARKET INDEX
FUND;

BROWN BROTHERS HARRIMAN & CO.;

BROWN BROTHERS HARRIMAN AND
COMPANY/ETF;

MID ATLANTIC CAPITAL CORP.;

BALDWIN ENTERPRISES, INC.;

HEARST EQUITY APPRECIATION PLAN;

JOHN DOE, AS ADMINISTRATOR OF HEARST
EQUITY APPRECIATION PLAN;

MUTUAL OF AMERICA INVESTMENT CORP.;

NEW YORK STATE INSURANCE FUND;

THE NEW YORK PROVINCE OF THE SOCIETY OF
JESUS;

EVOLUTION ALL-CAP EQUITY FUND;

DIREXION FUNDS;

WESTCHESTER CAPITAL MANAGEMENT LLC;

AMICI ASSOCIATES LP;

PORTER ORLIN LLC;

AMICI FUND INTERNATIONAL LTD.;

AMICI QUALIFIED ASSOCIATES LP;

BLUE CHIP FUND, A SERIES OF FIRST
INVESTORS EQUITY FUNDS;

JOHN R. POLATSCHEK;

JULIA K. ROSENWALD;

CARRET ASSET MANAGEMENT;

COLLECTORS' FUND LP;

TOWERVIEW LLC;

CAROL E. NEWMAN REVOCABLE TRUST UA 02-
10-2006;

CAROL E. NEWMAN, AS TRUSTEE OF THE
CAROL E. NEWMAN REVOCABLE TRUST UA 02-
10-2006;

IBEW LOCAL 25 RETIREMENT FUNDS MASTER
TRUST;

IGLESIA METODISTA DEL PERU;

THE RAPPAPORT FAMILY TRUST U/A DTD
06/04/1992;

MARJORIE ROZMAN, AS TRUSTEE OF THE
RAPPAPORT FAMILY TRUST U/A DTD 06/04/1992;

NANETTE ROSENBERG, AS TRUSTEE OF THE
RAPPAPORT FAMILY TRUST U/A DTD 06/04/1992;

THE TRUST U/A DTD 02/23/1981 BY MICHAEL
ROSENBERG;

MARJORIE ROZMAN, AS TRUSTEE OF THE
TRUST U/A DTD 02/23/1981 BY MICHAEL
ROSENBERG;

NANETTE ROSENBERG, AS TRUSTEE OF THE
TRUST U/A DTD 02/23/1981 BY MICHAEL
ROSENBERG;

THE TRUST U/A DTD 11/02/1977 BY ROBERT
ROSENBERG;

MARJORIE ROZMAN, AS TRUSTEE OF THE
TRUST U/A DTD 11/02/1977 BY ROBERT
ROSENBERG;

NANETTE ROSENBERG, AS TRUSTEE OF THE
TRUST U/A DTD 11/02/1977 BY ROBERT
ROSENBERG;

RBC GLOBAL ASSET MANAGEMENT INC.;

RBC O'SHAUGHNESSY CANADIAN EQUITY
FUND;

RBC O'SHAUGHNESSY U.S. VALUE FUND;

MARY LOU RICOTTA;

ST. FRANCIS FRIENDS OF THE POOR, INC.;

STEPHEN R. MANHEIMER;

THE FRANCISCAN MISSIONARY UNION;

AETOS CAPITAL LLC;

FERRIS TRADING FUND LLC;

JILL KAPLIN (A/K/A JILL KAPLIN HERZ);

THE ELIZABETH L. LEVIN 2006 SZ-2 YEAR
GRANTOR RETAINED ANNUITY TRUST UNDER
AGREEMENT DATED 07/31/06;

ELIZABETH L. LEVIN, AS TRUSTEE OF THE
ELIZABETH L. LEVIN 2006 SZ-2 YEAR GRANTOR
RETAINED ANNUITY TRUST UNDER
AGREEMENT DATED 07/31/06;

LOMBARDI & CO., INC.;

FIRST DATA INCENTIVE SAVINGS PLAN FBO
JOHN G. KOLOGI;

STATE STREET BANK & TRUST COMPANY, AS
TRUSTEE FOR FIRST DATA INCENTIVE SAVINGS
PLAN FBO JOHN G. KOLOGI;

JOHN G. KOLOGI;

TWIN SECURITIES, INC.;

ELIZABETH DE CUEVAS;

MOUNT ARARAT CEMETERY, INC.;

WABASH/HARVEST PARTNERS LP (F/K/A
WABASH HARVEST PARTNERS LP);

MURIEL HYMAN;

ARNOLD MANHEIMER;

SOPHIE MCCONNELL AND MALCOLM
MCCONNELL;

SOPHIE MCCONNELL;

MALCOLM MCCONNELL;

ALPHADYNE INTERNATIONAL MASTER FUND
LTD.;

DENNIS S. BUNDER;

CHARTER PARTNERS LP;

ELAINE CHEAH-RICHERT;

DIREXION INSURANCE TRUST;

EDITH A. EHRLICH;

HARVEST AA CAPITAL LP;

JAMES F. HOGE JR.;

INVENIO PARTNERS LP;

KELLOGG CAPITAL MARKETS LLC;

SCOTT R. KLARQUIST;

LATIGO MASTER FUND LTD.;

ANTHONY Y. LIN;

LP MA1 LTD.;

LATIGO PARTNERS LP;

MADISON PROPRIETARY TRADING GROUP LLC;

JIANSHI MAO;

WILLIAM V. MONOPOLI AND MARY K. MONOPOLI;

WILLIAM V. MONOPOLI;

MARY K. MONOPOLI;

NEW AMERICANS LLC;

GREGORY REYFTMANN;

LYXOR ALPHADYNE, SPC (F/K/A LYXOR STARWAY, SPC F/K/A SGAM AI STARWAY, SPC);

ALPHADYNE ASSET MANAGEMENT LLC;

JAY GOLDMAN MASTER LP;

TORO TRADING LLC;

WOODMONT INVESTMENTS LTD.;

JAY GOLDMAN & CO., LP;

HARVEST CAPITAL LP;

DAVID HOCHBERG;

GURDON H. METZ;

ROBERT MOSBERG; AND

DOES 1–5,000;

AND

DREYFUS INDEX FUNDS, INC.;

JOAN E. CLARK;

BESSEMER TRUST COMPANY;

GEORGE M. MOSS;

HUGH F. FAGAN;

EMPIRE STATE CARPENTERS PENSION;

FIERSTEIN COMPANY;

ANIMA SOCIETA DI GESTIONE;

DEXIA BANK; AND

NICHOLAS G. CHANTILES;

ON BEHALF OF THEMSELVES AND A CLASS OF
SIMILARLY SITUATED NATURAL PERSONS AND
JURIDICAL ENTITIES,

DEFENDANTS.

Plaintiffs Deutsche Bank Trust Company Americas ("**DBTCA**"), in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined), Law Debenture Trust Company of New York ("**Law Debenture**"), in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined), and Wilmington Trust Company ("**Wilmington Trust**" and, together with DBTCA and Law Debenture, "**Plaintiffs**"), in its capacity as successor indenture trustee for the PHONES Notes (as hereinafter

defined), by and through their undersigned counsel, respectfully allege in this Third Amended

Complaint as follows:

## <u>NATURE OF THE ACTION</u>

1.      This action arises from the failed leveraged buyout (the "**<u>LBO</u>**") of Tribune

Company ("**<u>Tribune</u>**") in 2007 — a transaction that financial and industry analysts

contemporaneously characterized as one of the most highly leveraged in history.  The LBO lined

the pockets of Tribune's former shareholders (the "**<u>Shareholders</u>**") with $8.3 billion of cash at

the expense of Tribune's creditors, and precipitated Tribune's careen into bankruptcy shortly

thereafter.

2.      Plaintiffs seek to avoid and recover, as constructively fraudulent, all transfers of

any proceeds received by each defendant in connection with the LBO.  These transfers may be

recovered from the defendants because:  (a) Tribune made the challenged transfers without

receiving reasonably equivalent value or fair consideration in exchange therefor; and (b) the

challenged transfers were made when Tribune– (i) was, or was thereby rendered, insolvent, (ii)

was engaged, or was about to engage, in a business or a transaction for which any property

remaining with Tribune was an unreasonably small capital, or (iii) intended to incur, or believed

that it would incur, debts that would be beyond Tribune's ability to pay as such debts matured.

*   *   *

3.      In mid-2006, Tribune's consolidated revenue was plummeting, its prospects were

dimming, and its stock price had dropped to around $27 per share from a high of nearly $40 just

twelve months earlier.  The largest Shareholders desperately wanted, and ultimately found, an

exit strategy:  On April 1, 2007, Tribune's board of directors (the "**<u>Tribune Board</u>**") approved a

bid by billionaire Samuel Zell ("**Zell**") to acquire Tribune through an extraordinarily leveraged buyout.

4.      In its most basic form, a leveraged buyout is a corporate acquisition where the acquirer purchases the outstanding stock of a target company using borrowed funds that are guaranteed by, or secured by the assets of, the target company itself.  Because leveraged buyout transactions replace the target company's outstanding equity with new debt, the law recognizes that LBOs are inherently risky to the target company's existing creditors and invite application of fraudulent-transfer law when the target company is left unable to satisfy its obligations to its pre-LBO creditors.  As aptly described by one court, "[f]rom a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders.  The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional kinds of fraudulent transfers."  Indeed, it is the cashed-out shareholders who receive the principal benefit in an LBO transaction; the target corporation, on the other hand, receives absolutely no benefit to offset the greater risk of operating as a highly leveraged enterprise.

5.      Before the LBO, Tribune and its direct and indirect subsidiaries (collectively, the "**Company**") had approximately $5.6 billion of funded debt obligations and a positive equity value.  As a result of the LBO, however, the Company increased its funded debt obligations by more than $8 billion and Tribune had a negative equity value.

6.      The LBO was designed as a single transaction that would be implemented in two steps.  Tribune executed the first step of the LBO ("**Step One**") on June 4, 2007, paying some of the Shareholders $4.3 billion (the "**Step One Shareholder Transfers**") for 52% of the outstanding stock at a premium price of $34 per share.  Tribune executed the second step of the LBO ("**Step Two**") on December 20, 2007, paying Shareholders another $4 billion (the "**Step**

**Two Shareholder Transfers**" and, together with the Step One Shareholder Transfers, the "**Shareholder Transfers**") for the remaining outstanding stock, also at the premium price of $34 per share.  This transaction was a textbook fraudulent transfer.

7.      Tribune received, and the Shareholders gave, no value whatsoever in exchange for the Shareholder Transfers.  To the contrary, Tribune only received the dubious honor of repurchasing its own stock, and a bloated debtload that increased to more than $13 billion — billions more than Tribune was actually worth, and nearly ten times the Company's actual cash flow for 2006 or projected cash flow for 2007.  This highly leveraged capital structure was nothing short of reckless.

8.      The Company was a terrible candidate for an LBO.  Nearly two-thirds of the Company's cash flow was generated from its newspaper businesses.  At the time of the LBO, the publishing industry was in the midst of a deepening, well-publicized structural decline.  Print circulation and advertising revenues were falling at a rapid clip across the entire industry as readership migrated online and to other media outlets.  The consensus among analysts, market participants, and rating agencies in 2007 was that these challenges were not cyclical and that the declines in circulation and advertising were not likely to abate anytime soon — if ever.

9.      To make matters worse, the Company significantly underperformed industry averages during the years and months leading up to the LBO.  In fact, just months before the close of Step One, both management and independent analysts reported that daily circulation for the Company's largest newspapers was decreasing at a more precipitous rate than the industry average decline.  Consequently, management had no reason to assume that circulation or advertising revenue would improve over the long term or that the Company could make-up any shortfalls.

10.     At the time Step One closed, the Company had already failed to meet management's projections for the first several months of 2007.  As of May 2007, year-to-date operating cash flow for the publishing segment was significantly lower than projected, and less than the prior year's actual results for the same period.  In fact, one of Tribune's largest newspapers was reported to have had "one of the worst quarters ever experienced" in the second quarter of 2007.  Consequently, just to meet full-year projections for 2007, the Company would have had to achieve an impossible trifecta during the second half of the year:  turn around the negative trend, <u>and</u> recoup the performance deficiencies from the first half, <u>and</u> significantly exceed 2006 performance.

11.     The Company did not achieve any of these objectives.  Rather, between the close of Step One and Step Two, the Company's financial and operating performance continued to deteriorate as significantly as it did rapidly.  As a result, financial and industry analysts repeatedly downgraded their expectations for the Company's performance, Tribune's stock price traded below $23 (a discount of more than 25% to the tender offer price of $34 per share), and Tribune's bond prices fell to almost 50 cents on the dollar for certain tranches of Tribune's longer-term debt.

12.     Market watchers and the media had long predicted and widely publicized that the LBO would ruin Tribune.  It did.  Before the close of Step Two, it was clear that the Company would be unable to meet its operating expenses from existing resources and shortly would be in a full-blown liquidity crisis.  Less than one year later, buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and the majority of its subsidiaries jointly filed for bankruptcy on December 8, 2008 (the "**Petition Date**").

13.     The jointly administered bankruptcy cases are currently pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Case No. 08-13141 (KJC).  On April 25, 2011, the Bankruptcy Court entered an order (the "**Standing Order**") that, in pertinent part:  (a) granted Plaintiffs relief from the automatic stay, to the extent it is applicable, to commence this action and accomplish service; and (b) ordered that this action shall be automatically stayed pending further order of the Bankruptcy Court.  Notwithstanding the foregoing, the Standing Order expressly authorized Plaintiffs immediately to pursue, among other things, discovery as necessary to prevent any applicable statutes of limitation or time-related defenses from barring the claims asserted in this action.  A copy of the Standing Order is appended hereto as Exhibit B.

14.     On June 28, 2011, the Bankruptcy Court entered an order (the "**Clarification Order**") that supplemented the Standing Order and, in pertinent part, authorized any party to move pursuant to 28 U.S.C. § 1407  to consolidate or coordinate this action with any or all of the other related actions commenced by Plaintiffs.  A copy of the Clarification Order is appended hereto as Exhibit C.

## THE PARTIES

### I.     Plaintiffs

15.     Plaintiff DBTCA is a trust company that is incorporated, and has its principal place of business, in the State of New York.  DBTCA is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of, the following debt securities issued by Tribune:

(a)     the 6.25% Notes due November 10, 2026, pursuant to the indenture, dated as of March 1, 1992, between Tribune and Citibank, N.A. ("**Citibank**") as trustee,

successor to The Bank of New York ("**BNY**"), Bank of Montreal Trust Company

("**BMT**"), and Continental Bank, N.A.;

      (b)    the 7.25% Debentures due March 1, 2013, pursuant to the indenture, dated

as of January 30, 1995 (the "**1995 Indenture**"), between Tribune, successor to The Times

Mirror Company ("**Times Mirror**"), and Citibank as trustee, successor to BNY, Wells

Fargo Bank, N.A. and First Interstate Bank of California;

      (c)    the 7.50% Debentures due July 1, 2023, pursuant to the 1995 Indenture;

      (d)    the 4.875% Notes due August 15, 2010, pursuant to the indenture, dated as

of January 1, 1997 (the "**1997 Indenture**"), between Tribune and Citibank, as trustee,

successor to BMT;

      (e)    the 5.25% Notes due August 15, 2015, pursuant to the 1997 Indenture; and

      (f)    the 5.67% Notes due December 8, 2008, pursuant to the 1997 Indenture.

16.    Plaintiff Law Debenture is a trust company that is incorporated, and has its

principal place of business, in the State of New York.  Law Debenture is the successor indenture

trustee to DBTCA for, and has been duly designated to prosecute and resolve the claims asserted

herein on behalf of, the holders of the following debt securities issued by Tribune:

      (a)    the 6.61% Debentures due September 15, 2027, pursuant to the indenture,

dated as of March 19, 1996 (the "**1996 Indenture**"), by and between Tribune, successor

to Times Mirror, and Citibank, as trustee; and

      (b)    the 7.25% Debentures due November 15, 2096, pursuant to the 1996

Indenture.

17.    The debt securities referred to in the two preceding paragraphs collectively have a

total face amount of approximately $1.263 billion, and collectively are referred to herein as the

"**Senior Notes**."  As of the Petition Date, Tribune owed $1.283 billion, exclusive of accrued

post-petition interest, to the holders of the Senior Notes.

18.     Plaintiff Wilmington Trust is a trust company that is incorporated, and has its

principal place of business, in the State of Delaware.  Wilmington Trust is the successor

indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted

herein on behalf of the holders of Exchangeable Subordinated Debentures due 2029 (the

"**PHONES Notes**"), pursuant to the indenture, dated as of April 1, 1999 between Tribune and

BMT, as trustee.  As of the Petition Date, Tribune owed $1.197 billion, exclusive of accrued

post-petition interest, to the holders of the PHONES Notes.

19.     The holders of the Senior Notes and the PHONES Notes, as well as their

respective successors and assigns, collectively are referred to herein as the "**Pre-LBO**

**Noteholders**."  The Pre-LBO Noteholders have unsatisfied claims against Tribune for the

payment of money on account of the Senior Notes and the PHONES Notes in an amount of no

less than $2.480 billion (the "**Pre-LBO Noteholder Claims**"), exclusive of accrued post-petition

interest.

20.     At the time the Step One Shareholder Transfers were made, the Senior Notes and

the PHONES Notes were issued and outstanding.

21.     At the time the Step Two Shareholder Transfers were made, the Senior Notes and

the PHONES Notes were issued and outstanding.

**II.     Defendants**

22.     The caption hereof, as supplemented by the information contained in Amended

Exhibit A appended hereto and incorporated by reference herein, constitutes a list of defendants

who are named parties to this action (collectively, the "**Named Shareholder Defendants**"), each of whom:

        (a)      either– (i) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) received proceeds of the Shareholder Transfers; and

        (b)      either is– (i) a natural person who resides in or is domiciled in the State of New York (this "**State**"), (ii) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State, or (iii) a natural person or juridical entity that, upon information or belief, in person or through an agent or affiliate, (A) regularly transacts or solicits business in this State, (B) derives substantial revenue from goods used or services rendered in this State, (C) derives substantial revenue from interstate or international commerce, or (D) maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

23.      Amended Exhibit A includes each Named Shareholder Defendant's address and, upon information and belief and where available, the dates and dollar amounts of proceeds of the Shareholder Transfers received by each such defendant and, where applicable, the capacity in which each such defendant is being sued.  To comply with confidentiality orders entered by the Bankruptcy Court, Plaintiffs filed under seal both Exhibit A to the Original Complaint and Exhibit A to the First Amended Complaint.  Plaintiffs have moved, or promptly will move, this Court for an order to seal an unredacted version of Amended Exhibit A.

24.     Does 1 through 5,000 (collectively, the "**Doe Defendants**") are natural persons or juridical entities, other than the Named Shareholder Defendants.  Each Doe Defendant's identity presently is unknown to Plaintiffs and both:

(a)     may be a necessary or proper party to this action; and

(b)     is either– (i) a natural person who resides in or is domiciled in this State, (ii) a juridical entity that is incorporated, organized, established, headquartered, or licensed to conduct business within this State, or (iii) a natural person or juridical entity that, upon information or belief, in person or through a partner, member, trustee, agent, or affiliate, (A) regularly transacts or solicits business in this State, (B) derives substantial revenue from goods used or services rendered in this State, (C) derives substantial revenue from interstate or international commerce, or (D) maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

25.     Defendant Dreyfus Index Funds, Inc. is a juridical entity that is organized in this State and, upon information and belief, has its principal place of business in this State.  Dreyfus Index Funds, Inc.: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

26.     Defendant Joan E. Clark is a natural person who resides in this State.  Joan E. Clark: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

27.     Defendant Nicholas G. Chantiles is a natural person who resides in this State. Nicholas G. Chantiles: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

28.     Defendant Bessemer Trust Company is a juridical entity that is organized in this State and, upon information and belief, has its principal place of business in this State.  Bessemer Trust Company: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

29.     Defendant George M. Moss is a natural person who resides in this State.  George M. Moss: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

30.     Defendant Hugh F. Fagan is a natural person who resides in this State.  Hugh F. Fagan: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

31.     Defendant Empire State Carpenters Pension is a juridical entity that is organized in this State and, upon information and belief, has its principal place of business in this State. Empire State Carpenters Pension: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

32.     Defendant Fierstein Company is a juridical entity that is organized in this State and, upon information and belief, has its principal place of business in this State.  Fierstein Company: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

33.     Defendant ANIMA Societa Di Gestione is a juridical entity organized under the laws of Italy and, upon information and belief, in person or through an agent or affiliate, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, derives substantial revenue from interstate or international commerce, or maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.  ANIMA Societa Di Gestione: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

34.     Defendant Dexia Bank is a juridical entity organized under the laws of Bermuda and, upon information and belief, in person or through an agent or affiliate, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, derives substantial revenue from interstate or international commerce, or maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.  Dexia Bank: (a) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received proceeds of the Shareholder Transfers.

35.     The defendants named in the ten preceding paragraphs collectively are referred to herein as the "**Shareholder Class Representatives**."   Each of the Shareholder Class Representatives is named: (a) individually as– (i) a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) a recipient of proceeds of the Shareholder Transfers; and (b) in its capacity as a representative for all Shareholder Class Members (as hereinafter defined).

## CLASS ALLEGATIONS

36.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a defendant class (the "**Shareholder Class**") comprising:

> All natural persons and juridical entities, other than Excluded Persons (as hereinafter defined), that:  (a) either– (i) were legal or beneficial owners of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) received proceeds of the Shareholder Transfers; and (b) either– (i) reside in or are domiciled in this State, (ii) are incorporated, organized, established, or conduct or are licensed to conduct business within this State, or (iii) in person or through a partner, member, trustee, agent, or affiliate, (A) regularly transact or solicit business in this State, (B) derive substantial revenue from goods used or services rendered in this State, (C) derive substantial revenue from interstate or international commerce, or (D) maintain relations to or engage in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

37.     The following natural persons and juridical entities (the "**Excluded Persons**") are excluded from the Shareholder Class:

(a)     all Named Shareholder Defendants (other than the Shareholder Class Representatives) that are effectively served with a summons and complaint within the time period required by Rule 4(m) of the Federal Rules of Civil Procedure or as extended by this Court; and

(b)      all named defendants properly sued in any other action commenced by Plaintiffs to avoid and recover the transfer of any proceeds received in connection with the LBO that are effectively served with a summons and complaint within the time period required by Rule 4(m) of the Federal Rules of Civil Procedure or analogous state rule.

38.      Upon information and belief, the Shareholder Class comprises no fewer than 3,100 natural persons and juridical entities (each, a "**Shareholder Class Member**").  Because of the large number of Shareholder Class Members, joinder of all such defendants in a single action is impracticable.

39.      Numerous questions of law and fact are common to all Shareholder Class Members.  These common questions of law and fact include, but are not limited to:

(a)      Whether Tribune received reasonably equivalent value or fair consideration in exchange for the Shareholder Transfers;

(b)      Whether, at the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation;

(c)      Whether, at the time the Shareholder Transfers were made, Tribune was engaged in a business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital in relation to the business or transaction; and

(d)      Whether, at the time the Shareholder Transfers were made, Tribune intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

40.     Any claims against and claimed defenses of the Shareholder Class Representatives are typical of the claims against and claimed defenses of the Shareholder Class Members.  The claims against and claimed defenses of the Shareholder Class Members arise out of the same factual circumstances involving the LBO and the Shareholder Transfers.

41.     The Shareholder Class Representatives collectively face an approximate risk of loss of at least $11,246,792.  Therefore, the Shareholder Class Representatives will fairly and adequately protect the interests of the Shareholder Class Members and have as much or more incentive to vigorously defend against the claims asserted herein than would any Shareholder Class Member individually.

42.     The various claims asserted on a class basis in this action are properly certifiable pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecuting separate actions by or against each Shareholder Class Member would create a risk of: (a) inconsistent or varying adjudications with respect to each Shareholder Class Member that would establish incompatible standards of conduct; or (b) adjudications with respect to each Shareholder Class Member that, as a practical matter, would– (i) be dispositive of the interests of the other Shareholder Class Members not parties to the individual adjudications, or (ii) substantially impair or impede the ability of other Shareholder Class Members not parties to the individual adjudications to protect their interests.

43.     The various claims asserted on a class basis in this action are properly certifiable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because: (a) the questions of law or fact common to the Shareholder Class Members predominate over any questions affecting only Shareholder Class Members individually; and (b) a defendant class action is superior to other available methods for fairly and efficiently adjudicating this controversy.  A defendant

class action will avoid — and be far more efficient than prosecuting — a multiplicity of

individual adjudications with respect to each Shareholder Class Member, thereby conserving the

resources of the parties and of the Court.

## JURISDICTION AND VENUE

44.     Pursuant to 28 U.S.C. § 1334(b), this Court has original subject-matter

jurisdiction over this action because it is "related to" the jointly administered Tribune bankruptcy

cases currently pending in the Bankruptcy Court insofar as, among other things:  (a) this action

was commenced pursuant to the Standing Order issued by the Bankruptcy Court; (b) the

Bankruptcy Court has retained jurisdiction to hear and decide disputes relating to or arising from

the Standing Order; and (c) a judgment in favor of Plaintiffs in this action, which provides them

with an additional source of recovery, may affect the ultimate distributions Plaintiffs are entitled

to receive on account of their allowed claims from– (i) the Tribune bankruptcy estates and (ii)

litigation trusts to be established under any confirmed plan of reorganization.

45.     Pursuant to 12 U.S.C. § 632, this Court has original subject-matter jurisdiction

over this action because: (a) this is a civil action at common law or in equity; (b) Shareholder

Defendants Bessemer Trust Company and US Trust Co. N.A. are corporations organized under

the laws of the United States; and (c) as conceded by several of the institutions that financed the

LBO or advised Tribune in connection therewith, the factual allegations underlying this action

arise out of transactions that involve international or foreign banking, or international or foreign

financial operations either directly or through the agency, ownership, or control of branches or

local institutions in dependencies or insular possessions of the United States or in foreign

countries, insofar as– (i) the distribution of Shareholder Transfers to the Shareholders in

connection with the LBO was funded with loans provided by a syndicate of United States and

foreign banks, including Barclays Bank PLC of the United Kingdom and Sumitomo Mitsui Banking Corp. of Japan, and (ii) at least $340 million in Shareholder Transfers were made from the United States to recipients in at least 40 foreign countries, including Canada, Japan, The Netherlands, Switzerland, and the United Kingdom.

46.      This Court has personal jurisdiction over each of the Named Shareholder Defendants, each of the Doe Defendants, each of the Shareholder Class Representatives, and each of the Shareholder Class Members (collectively, the "**Shareholder Defendants**") to the extent that a Shareholder Defendant is: (a) a natural person who resides in or is domiciled in this State; (b) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State; or (c) a natural person or juridical entity that, upon information or belief, in person or through a partner, member, trustee, agent, or affiliate, (A) regularly transacts or solicits business in this State, (B) derives substantial revenue from goods used or services rendered in this State, (C) derives substantial revenue from interstate or international commerce, or (D) maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

47.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because:

(a)      both– (i) at least one of the Shareholder Defendants resides in this District, and (ii) all of the Shareholder Defendants reside in this State;

(b)      a  substantial part of the events or omissions giving rise to the claims in this action occurred, or a substantial part of the property that is the subject of this action is situated, in this District; or

(c)      at least one of the Shareholder Defendants was subject to the personal

jurisdiction of this Court at the time the action was commenced, if there is no district in

which this action may otherwise be brought.

## FACTUAL BACKGROUND

### I.      The Company's Business and Historical Performance

48.      Founded in 1847, Tribune reaches more than 80% of U.S. households through its

newspapers and other publications, its television and radio broadcast stations and cable channels,

and its other entertainment offerings.  Headquartered in Chicago, Illinois, Tribune's operations

are conducted through two primary business segments.  Tribune's publishing segment owns

major newspapers in many of the most significant markets in the United States, including

the Chicago Tribune, the Los Angeles Times, the Baltimore Sun, the South Florida Sun-

Sentinel, the Orlando Sentinel, and Newsday.  Tribune's broadcasting and entertainment

segment owns numerous radio and television stations in major markets.

### II.     The Company's Financial Condition Deteriorates and the Shareholders Begin
### Agitating for Change

49.      In June 2000, Tribune merged with Times Mirror, which was owned by the

Chandler family.  As a result of this merger, the Chandler family, through Chandler Trust No. 1

and Chandler Trust No. 2 (collectively, the "**Chandler Trusts**"), became Tribune's second

largest shareholder and was awarded three seats on the Tribune Board.

50.      The market did not react well to the merger with Times Mirror and, over the

course of the next few years, the Company experienced a steady decline in revenues,

profitability, and its stock price.  In response, Tribune took repeated steps to reduce costs by

liquidating assets and shedding jobs.  But the numbers continued to drop.  By 2006, the

Company's profitability was exhibiting quarter-over-quarter declines compared to both 2004 and the majority of 2005.

51.     In or about February 2006, the Chandler Trusts' patience ran out and they began to complain about the Company's performance and to criticize the Tribune Board.  The Chandler Trusts admonished the Tribune Board that, absent an upturn in Tribune's stock price, the Chandler Trusts would themselves begin exploring a "fundamental transaction" involving Tribune.

52.     In May 2006, the Tribune Board decided to engage in a leveraged recapitalization pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock.  The Chandler Trusts' three representatives on the Tribune Board, however, voted against the transaction.

53.     In a publicly filed letter to the Tribune Board on June 13, 2006, the Chandler Trusts advised that they would not participate in the planned repurchase.  The Chandler Trusts complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different."  The Chandler Trusts explained that "[t]he gravity of management's failure to address fundamental strategic issues is apparent from the precipitous decline in stock value over the past three and a half years. . . . [S]ince the beginning of 2003 (when current management of Tribune was put into place), the value of Tribune's stock has declined over 38% — substantially worse than both the newspaper peer group (down 8.8%) and the broadcasting peer group (down 29%)."  The Chandler Trusts added that "it is the time for prompt, comprehensive action."

54.     On June 27, 2006, Tribune nonetheless announced that it had elected to proceed with the repurchase of 55 million shares through a public tender offer and a private transaction

(the "**2006 Repurchase**") with the Robert R. McCormick Tribune Foundation and the Cantigny Foundation (collectively, the "**Foundations**" and, together with the Chandler Trusts, the "**Large Shareholders**") at a cost of nearly $1.8 billion which was financed with debt.  As a result of the 2006 Repurchase, the Chandler Trusts became Tribune's largest stockholders and the Foundations continued to be major shareholders.

55.     Unfortunately, the 2006 Repurchase failed to raise Tribune's stock price.  To make matters worse, as a result of the 2006 Repurchase, the Company's debt materially increased by almost 50% and Moody's Investors Service cut Tribune's bond rating to "junk" status.

56.     After the failed 2006 Repurchase, the Large Shareholders redoubled their efforts to effect change at Tribune.  Because of the Chandler Trusts' publicly expressed discontent and their increasing pressure on management, in September 2006, the Tribune Board announced that it had established a special committee to oversee management's exploration of transactions that might maximize the value of Tribune stock.

## III.     The LBO is Proposed and Approved

57.     In late January 2007, billionaire investor Zell emerged as a potential buyer for Tribune.  Before Zell's emergence on the scene, the Tribune Board had been considering transactional alternatives to placate the Large Shareholders, including a possible sale of the entire Company or select assets, as well as an internal recapitalization.

58.     Zell proposed a wholly new option.  On or about February 6, 2007, Zell wrote to the Tribune Board and proposed to acquire Tribune in an LBO transaction.

59.     Under Zell's proposal, the Company would borrow nearly $11 billion — while Zell would invest just $315 million of his own money — to buy out the Shareholders.  In other

words, Zell sought to acquire the Company by putting up less than 3% of the risk capital and shifting all of the risk of the transaction onto the shoulders of the Company's existing creditors.

60.     On March 10, 2007, management informed Zell that it was skeptical of proceeding with his LBO proposal because of its high degree of leverage.  Only a week before the LBO was announced, a senior Tribune officer wrote to Tribune's treasurer after reviewing financial projections: "[I]f I am reading this right, we have a pretty narrow band for success under the [deal]–i.e., if we are off plan by 2% we have no value in the ESOP for 5 years."  The treasurer responded and confirmed: "yes, if we hit the down 2 case there is no equity value in the first 5 yrs."

61.     However, the prospect of obtaining a windfall for themselves and the Shareholders was too hard to resist.  Management dismissed the concerns over the Company's financial future and approved the LBO on April l, 2007.

62.     The merger agreement contemplated a single transaction in two steps.  In connection with Step One, Tribune would purchase 52% of Tribune's common stock in a tender offer at the premium price of $34 per share.  In connection with Step Two, Tribune would purchase all of the remaining Tribune common stock at the same premium price of $34 per share in a merger that would ultimately take Tribune private.  To finance the deal, the Company committed to borrow nearly $11 billion — more than $8.2 billion of which was funneled to the Shareholders as Shareholder Transfers.  The remainder of the loan proceeds was used to pay lender and advisor fees, transaction costs and expenses, and to refinance the debt incurred in connection with the 2006 Repurchase.

63.     Notwithstanding its two-step structure, the LBO was conceived, promoted, and proceeded as (and, in economic reality, was) an integrated transaction in which neither Step One

nor Step Two was intended to occur on its own.  In fact, had there been a way to structure the

LBO so that only a single step were necessary, the LBO would have been structured accordingly.

64.     The Tribune Board approved both Step One and Step Two at the same time, and

promoted the LBO as a single transaction, indicating that management intended both steps to

constitute one integrated transaction.  For example, on April 2, 2007, Tribune publicly

announced that it had agreed to the Zell proposal.  Tribune's press release stated, in pertinent

part:

> With the completion of its strategic review process, Tribune
> Company today announced a transaction which will result in the
> company going private and Tribune shareholders receiving $34 per
> share.  Sam Zell is supporting the transaction with a $315 million
> investment.  Shareholders will receive their consideration in a two-
> stage transaction.  Upon completion of the transaction, the
> company will be privately held, with an Employee Stock
> Ownership Plan ('ESOP') holding all of Tribune's then
> outstanding common stock and Zell holding a subordinated note
> and a warrant entitling him to acquire 40 percent of Tribune's
> common stock.  Zell will join the Tribune board upon completion
> of his initial investment and will become chairman when the
> merger closes.  The first stage of the transaction is a cash tender
> offer for approximately 126 million shares at $34 per share.  The
> tender offer will be funded by incremental borrowings and a $250
> million investment from Sam Zell . . . .  The second stage is a
> merger expected to close in the fourth quarter of 2007 in which the
> remaining publicly-held shares will receive $34 per share.  Zell
> will make an additional investment of $65 million in connection
> with the merger, bringing his investment in Tribune to $315
> million.

65.     The primary structural mechanism used to execute the LBO was created for the

sole purpose of generating certain tax benefits.  Those benefits, however, could only be realized

upon consummation of Step Two.  Thus, the LBO made economic sense only if Step Two closed

and the anticipated tax savings could be realized.

66.     The lenders that financed the LBO analyzed Step One and Step Two concurrently,

and the commitment letters for both steps of the transaction were executed at the same time, cross-referenced each other, and obligated the lenders to provide financing for Step One and Step Two.  Moreover, the same exact lenders financed both steps of the LBO pursuant to a single credit agreement that interlocked the financing of both steps with a loss-sharing provision and based the fees and interest rate associated with the Step One loans upon the Company's debt load following Step Two.  On March 28, 2007, Tribune's treasurer instructed that a draft press release should state that "Tribune has received committed financing from Citigroup, Merrill Lynch and JPMorgan sufficient to complete both steps of the transaction."

67.    As was widely acknowledged by all of the parties involved, shareholder approval for the LBO was virtually guaranteed from the LBO's inception as a result of a voting agreement with the Chandler Trusts.  Indeed, after Tribune purchased half of its outstanding common stock in connection with Step One, nearly half of the remaining shares were held by the Large Shareholders and others directly under Zell's control.

68.    At Tribune's shareholder meeting on August 21, 2007, almost 65% of Tribune's common stock outstanding (and 97% of the shares that were voted) approved Step Two.  In the press release announcing the results of the shareholder vote, Tribune's former Chairman and CEO was quoted as saying, "With financing fully committed, we anticipate closing the transaction in the fourth quarter, following FCC approval and satisfaction of the other closing conditions."

69.    The parties and industry experts also believed that the LBO would obtain regulatory approval from the FCC, one of the closing conditions.  As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected.  On May 3, 2007, for example, Fitch Ratings reported its view that the necessary regulatory approvals

associated with Step Two would be obtained.

## IV.   The Disastrous Consequences of the LBO were Foreseeable (and Foreseen)

70.     The Shareholders approved the LBO — and reaped the financial benefits of the Shareholder Transfers — even though they knew, should have known, or had reason to know that it would render Tribune insolvent, inadequately capitalized, or unable to satisfy its obligations.  Indeed, as made clear by a cascade of contemporaneous news reports and ratings downgrades, the generally unfavorable reaction to the LBO came swiftly and loudly.

71.     On April 3, 2007 — just one day after the deal was announced — a Goldman Sachs analyst reported that "with estimated annual interest expense of over $1bn/yr and estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this challenging newspaper operating environment."  The analyst pointed out that the LBO's high leverage left Tribune in a "precarious financial position."

72.      A Lehman Brothers analyst reported on April 26, 2007 that the "[p]roposed deal leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far too high for secularly declining businesses. . . .  Debt payments should overwhelm EBITDA, by our calculations."

73.     On March 16, 2007, that same Lehman Brothers analyst warned that "putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy with or without the added tax savings" that Zell anticipated.

74.     On March 29, 2007, Standard & Poor's had a similar prediction and sent a letter to Tribune's treasurer, stating that it would downgrade Tribune's credit rating because "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."

75.     On August 14, 2007, a Lehman Brothers analyst once again warned:

> [W]e continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% — given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs. . . . So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year.

The analyst's cautionary warnings, of course, proved accurate.

76.     Spooked by the enormous leverage being foisted upon the Company in connection with the LBO, all of the major rating agencies consistently and continuously downgraded Tribune's debt ratings — ultimately to "junk" or "near junk" status — on nearly a dozen occasions from the time the deal was announced until Tribune filed for bankruptcy.

77.     Financial analysts and rating agencies were not alone in recognizing the devastating consequences of the proposed LBO.  As soon as the LBO was announced, a growing chorus of news outlets also began reporting the substantial risk of the proposed transaction, openly questioned the proposal's soundness, and highlighted the crushing debtload that the LBO would create.

78.     For example, on April 2, 2007, the Baltimore Sun — one of Tribune's own newspapers — questioned the wisdom of the proposed LBO: "The deal, which would return Tribune to private ownership, would make the company one of the most heavily indebted enterprises in the media industry at a time of falling readership and declining advertising revenues."  Tribune's rivals were "dumbfounded" by the deal, observed the reporter.

79.     On April 3, 2007, Bloomberg News quoted an industry analyst who stated that, for the LBO to succeed, Tribune either had to significantly cut costs or experience "significant

growth." The analyst remarked that "There just isn't a scenario that shows how this industry or this company is going to get significantly better." The article essentially predicted that, absent a miracle, Tribune could not survive the LBO.

80.     The very same day, The New York Times reported that the proposed sale came with some "big risks," observing that the LBO "would saddle the company with $13 billion in debt even as advertising sales and circulation decline."

81.     In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the Wall Street Journal quoted a Barclays Capital analyst who indicated that "We think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

82.     On April 6, 2007, The New York Times characterized the proposed LBO as "one of the most absurd deals ever."

83.     On April 16, 2007, Businessweek also raised serious concerns as to the highly leveraged nature of the proposed LBO:

> How leveraged? The just-announced deal orchestrated by investor Sam Zell leaves the company with more than $13 billion in debt. To put that in its proper perspective, Tribune's cash flow in '06— earnings before interest, taxes, depreciation, and amortization, or EBITDA—was $1.3 billion. Thus its debt exceeds last year's EBITDA by about ten times. This is an angina-inducing multiple even for veteran media players accustomed to playing with debt, some of whom get nervous above six. And Tribune's cash flow comes in large part from big-city Old Media properties, which are not noted for their stability right now. (Tribune's revenues declined by more than 5% in February.)

84.     On December 3, 2007, Barron's echoed this concern, reporting that "[t]he combination of a weakening economy and heavy debt loads is causing trouble for many companies that went private in leveraged buyouts since the start of 2006." While noting the

general increase in risk of LBOs, Barron's called-out Tribune in particular: "One pending LBO that could be a financial disaster is Tribune (TRB)."

85.     Financial-market participants also recognized, almost immediately, that Tribune inevitably would crumble under the weight of the debtload imposed by the LBO.  Prices for Tribune credit-default swaps ("**CDS**"), a form of "insurance" that would pay out if Tribune defaulted on its obligations, skyrocketed on the day the LBO was announced and continued to soar through the close of Step Two.

86.     A June 7, 2007 Bloomberg News article chronicled the ever-increasing price of a Tribune CDS, and the ever-increasing risk of the LBO to Tribune's creditors:

> Leveraged buyouts are financed by adding debt onto the target company, increasing the risk that existing bonds and loans may not be repaid.  In Tribune's case, the perceived risk of owning its 5-year bonds tripled after Zell's buyout was reported, based on credit-default swap prices.

87.     On July 20, 2007, Bloomberg News reiterated what the climbing CDS price indicated in terms of Tribune's chances of survival after the LBO:

> Tribune Co. has a 50-50 chance of missing interest payments on some of the $13 billion in debt it will have after real estate investor Sam Zell buys the company, trading in the company's credit-default swaps shows.  Prices of the swaps, financial contracts used to speculate on a company's ability to repay debt, have jumped $331,000 since the first step in the sale was completed in May.  It costs $770,000 to protect $10 million of Tribune bonds for five years, according to CMA Datavision, indicating a more than 50 percent risk of default. That's up from 32 percent on May 24, based on a JPMorgan Chase & Co. pricing model.

The article went on to explain that "Tribune swaps prices imply investors consider the company the fourth-riskiest debt issuer among the almost 1,200 worldwide whose credit-default swaps were quoted this week by London-based CMA."

88.     Although the risks to the Company's creditors were apparent, the Shareholders overwhelmingly supported the LBO: 92% of Tribune's stock was tendered at Step One, and 97% percent of voting Shareholders voted in favor of Step Two.  An August 21, 2007 article in Medill Reports quoted one Tribune shareholder who succinctly summarized the Shareholders' rationale for approving the deal: "If you're making money on [the deal], sure, what the hell."

## V.     **The Company's Financial Impairment and Flawed Solvency Opinions**

89.     Because of the Company's moribund financial prospects and the extraordinarily leveraged nature of the LBO, one of the closing conditions — securing viable solvency opinions in connection with both Step One and Step Two — was poised to jeopardize the deal.  And finding a firm to provide the requisite opinions turned out to be no easy task.  Indeed, Valuation Research Corporation ("**VRC**"), the financial advisory firm that ultimately provided Tribune with the necessary solvency opinions, was the last-ditch choice for Tribune after other firms declined the engagement.

90.     Tribune first approached Houlihan Lokey Howard & Zukin ("**Houlihan**"), a prominent solvency opinion firm.  Houlihan, however, expressed serious reservations regarding its ability to provide a solvency opinion in connection with such a highly leveraged transaction and declined even to accept the engagement.  Tribune scrambled to find another firm that might provide the necessary opinions.

91.     VRC was aware of Houlihan's reservations about the proposed LBO and recognized that Houlihan's reluctance raised the risk profile associated with the project.  Due to the risk attached to the highly leveraged deal, and Houlihan's disinclination to get involved, VRC was able to demand among the highest fees VRC had ever received for solvency opinion work.  In exchange, VRC provided the Tribune Board with: (a) written opinions, dated May 9,

2007, and May 24, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step One; and (b) a written opinion, dated December 20, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step Two.

92.     Two uncommon aspects of VRC's engagement are noteworthy.  First, VRC was instructed to ignore the generally accepted definition of "fair value" and, instead, to measure fair value in relation to a willing buyer and a willing seller <u>both of whom receive the favorable federal income tax treatment of the ESOP</u>.  As a result of this built-in limitation, VRC never offered any opinion as to whether Tribune or the Company would be solvent if it were to be acquired by an entity that did not receive the uniquely favorable federal income tax treatment.  Second, VRC was excused from the typical obligation to affirmatively investigate and skeptically evaluate any information provided by management.  Consequently, VRC never independently assessed the (un)reasonableness of management's unjustifiably optimistic projections upon which all of VRC's solvency opinions were based.

**(A)     Step One**

93.     VRC's Step One solvency analysis in May 2007 was based upon financial projections that were finalized by management and approved by the Tribune Board in February 2007 (the "**February Projections**").

94.     The February Projections were substantially higher than the Company's actual operating results.  For the three months from March through May 2007, publishing revenues and earnings were below plan by $50.6 million and $29.7 million, respectively.  During the same period, broadcasting revenues and earnings were below plan by $9.4 million and $4.6 million, respectively.

95.     Management, who received weekly "flash reports," was fully aware that the

February Projections were outdated and unreliable almost immediately after they were finalized and approved.  Despite this awareness, management persistently declined to revise and update the February Projections until long after Step One had closed.

96.     As a result of the foregoing, the February Projections were unreasonable and unreliable.  Notwithstanding management's acknowledgements that the Company's actual results were lagging the February Projections, those projections were not updated before VRC's Step One solvency opinions were issued.  In fact, management failed to provide any updated financial projections to VRC until late September 2007.

97.     The solvency opinions provided by VRC at Step One were substantially flawed and unreliable for a number of reasons, including but not limited to:

(a)     VRC blindly used the outdated, unreasonable, and unwarranted February Projections supplied by management without any critical analysis.

(b)     VRC artificially separated the two steps of the LBO for purposes of its Step One solvency analysis despite the fact that the LBO was conceived of and promoted as a single, integrated transaction for which financing was fully committed.

(c)     VRC improperly modified the conventional definition of "fair market value" to mean that a "fair market" buyer would be structured to receive the same favorable tax treatment as the ESOP in connection with the LBO.

(d)     VRC inappropriately reduced the weight given to its discounted cash flow analysis and increased the weight given to its higher comparable transactions analysis to increase Tribune's overall valuation.

(e)     VRC incorrectly assumed that Tribune would be able to refinance its debts as they matured.

98.     As of June 4, 2007, the correct fair market value of the Company's assets was approximately $10.99 billion.  Tribune had obligated itself to consummate an LBO that would saddle it with debt and contingent liabilities of approximately $14.03 billion.  As a consequence, and as of the closing of Step One, the Company was insolvent to the extent of approximately $3.04 billion.

99.     Of course, the Company had been highly leveraged in comparison to its peers even before the LBO.  After Step One, however, its debt-to-EBITDA ratio further skyrocketed to 11.4 — more than six times that of its most highly leveraged competitor, and more than eight times that of the industry average.  The Company's debt-to-equity ratio (book value) plummeted below zero, to a ratio of approximately negative 3.5.

100.     The Company could not service the significant amount of leverage imposed by the LBO and lacked adequate capital liquidity to operate its business following Step One.  The Company had an interest-coverage ratio of 1:1, the lowest among its peers, and was unlikely to be able to cover its interest expense.  The Company's operating cash flows were also insufficient to meet its debt service obligations.

101.     Following Step One, the Company had insufficient capital resources to fund its operations and service its debt while maintaining an adequate cushion for reasonably foreseeable stresses, downturns, and contingencies.

**(B)     Step Two**

102.     VRC's Step Two solvency analysis exhibited many of the same flaws and skewed assumptions as VRC's Step One solvency analysis, including VRC's novel and improper definition of "fair market value" and the inappropriate weighting that VRC assigned to its different valuation methodologies.

103.    In addition, VRC's Step Two solvency analysis in December 2007 was based upon unreasonable and unreliable financial projections that were updated by management and presented, in part, to the Tribune Board in October 2007 (the "**October Projections**").

104.    The October Projections were, to some degree and in the near-term, downward revisions of the February Projections.  However, despite the continued deterioration of the Company's performance after Step One closed, certain critical forecasts in the October Projections were dramatically revised upward from the February Projections.

105.    For example, the October Projections assumed that, as early as 2009, Tribune's internet-based business would generate significantly greater revenues than anticipated in the February Projections and, thereby, mitigate the continuing decline in Tribune's traditional publishing business.  Yet, the internet-based business had already failed to meet management expectations in 2007.

106.    The October Projections also forecasted that, beginning in 2013 and accelerating through 2017, the Company's revenue would significantly outperform the February Projections on a consolidated basis.  It was patently unreasonable, however, for the Company to assume that each of the five years following the 2012 election year would also enjoy the benefit of the bump in revenue occasioned by swells of political advertising.

107.    As a result of the foregoing, the October Projections were unreasonable and unreliable.  Nonetheless, VRC indiscriminately relied upon the October Projections when preparing its Step Two solvency opinion.

108.    As of December 20, 2007, the correct fair market value of the Company's assets was approximately $10.44 billion.  The Company's debt and contingent liabilities totaled

approximately $13.76 billion.  As a consequence, as of the closing of Step Two, the Company was insolvent to the extent of approximately $3.32 billion.

109.    Following Step Two, the Company was excessively leveraged, experiencing a debt-to-EBITDA ratio that was nearly double that of its closest peer, and more than eight times higher than the average of its other peers.  In addition, the Company was the only one of its peers that had a negative debt-to-equity ratio, and had the lowest interest-coverage ratio among its peers.

## VI.    The Aftermath of the LBO

110.    Because of the LBO, Tribune's funded debtload soared from more than $5 billion to nearly $14 billion — ten times greater than the Company's actual cash flow for 2006 or projected cash flow for 2007.

111.    As was widely predicted by a cacophony of financial analysts, industry experts, rating agencies, market participants, and media outlets alike, the Company's financial health deteriorated rapidly after the LBO closed.  On July 14, 2008, for example, the Associated Press reported that the Los Angeles Times planned to cut 250 positions because the Company was "struggling to service th[e] debt" taken on in connection with the LBO.  None of Tribune's cost-cutting measures, however, could forestall the inevitable.

112.    Buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and its most valuable operating subsidiaries jointly filed for bankruptcy on December 8, 2008.

113.    Tribune's own publicly filed estimates in the Bankruptcy Court valued the Company at approximately $6.1 billion in 2010 — less than half of the Company's debtload at the close of Step Two.

114.     The Pre-LBO Noteholders have yet to receive payments on the Pre-LBO

Noteholder Claims; and under the two plans of reorganization currently being considered before

the Bankruptcy Court, the Pre-LBO Noteholders would receive initial distributions of only a

small fraction of the money they are owed.

**COUNT ONE**
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,**
**Including Against the Shareholder Class Representatives,**
**Individually and as Representatives of the Shareholder Class**
**Pursuant to N.Y. DEBT. & CRED. LAW §§ 273, 278 & 279)**

115.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs,

which are incorporated by reference as if set forth fully herein.

116.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step

One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in

connection with Step One of the LBO.

117.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion

of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants

— in connection with Step Two of the LBO.

118.     Tribune did not receive, and none of the Shareholder Defendants gave, fair

consideration in exchange for the Shareholder Transfers.

119.     At the time the Shareholder Transfers were made or as a result of making the

Shareholder Transfers, the present fair salable value of Tribune's assets was less than the amount

that would have been required to pay Tribune's probable liabilities on its existing debts as they

became absolute and matured.

120.     Accordingly, the Shareholder Transfers should be set aside and recovered to the

extent necessary to satisfy the Pre-LBO Noteholder Claims.

**COUNT TWO**
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,**
**Including Against the Shareholder Class Representatives,**
**Individually and as Representatives of the Shareholder Class**
**Pursuant to N.Y. DEBT. & CRED. LAW §§ 274, 278, & 279)**

121.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs,
which are incorporated by reference as if set forth fully herein.

122.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step
One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in
connection with Step One of the LBO.

123.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion
of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants
— in connection with Step Two of the LBO.

124.    Tribune did not receive, and none of the Shareholder Defendants gave, fair
consideration in exchange for the Shareholder Transfers.

125.    At the time the Shareholder Transfers were made, Tribune was engaged or was
about to engage in a business or transaction for which the property remaining with Tribune after
making the Shareholder Transfers was an unreasonably small capital.

126.    Accordingly, the Shareholder Transfers should be set aside and recovered to the
extent necessary to satisfy the Pre-LBO Noteholder Claims.

**COUNT THREE**
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,**
**Including Against the Shareholder Class Representatives,**
**Individually and as Representatives of the Shareholder Class**
**Pursuant to N.Y. DEBT. & CRED. LAW §§ 275, 278, & 279)**

127.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs,
which are incorporated by reference as if set forth fully herein.

128.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

129.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

130.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

131.     At the time the Shareholder Transfers were made, Tribune intended or believed that it would incur debts beyond its ability to pay as they matured.

132.     Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

**<u>COUNT FOUR</u>**
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,**
**Including Against the Shareholder Class Representatives,**
**Individually and as Representatives of the Shareholder Class**
**Pursuant to 740 ILL. COMP. STAT. 160/5(a)(2), 160/8, & 160/9)**

133.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

134.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

135.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

136.     Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

137.     At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

138.     At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

139.     Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

### COUNT FIVE
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,
Including Against the Shareholder Class Representatives,
Individually and as Representatives of the Shareholder Class
Pursuant to 740 ILL. COMP. STAT. 160/6(a), 160/8, & 160/9)**

140.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

141.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

142.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

143.     Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

144.    At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation.

145.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

**COUNT SIX**
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,**
**Including Against the Shareholder Class Representatives,**
**Individually and as Representatives of the Shareholder Class**
**Pursuant to MASS. GEN. LAWS ch. 109A, §§ 5(a)(2), 8, & 9)**

146.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

147.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

148.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

149.    In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare Trust Company, N.A. ("**Computershare**"), located in Braintree, Massachusetts, as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

150.     Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

151.     At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

152.     At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

153.     Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

**COUNT SEVEN**
**(Constructive Fraudulent Transfer Against the Shareholder Defendants,**
**Including Against the Shareholder Class Representatives,**
**Individually and as Representatives of the Shareholder Class**
**Pursuant to MASS. GEN. LAWS ch. 109A, §§ 6(a), 8, & 9)**

154.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

155.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

156.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

157.     In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by

Tribune: (a) appointed Computershare as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

158.     Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

159.     At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets, at a fair valuation.

160.     Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted by applicable law or by agreement, to assert any claims relating to the subject matter of this action against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court grant the following relief:

(a)     certifying the Shareholder Class pursuant to Rules 23(b)(1) or 23(b)(3) of the Federal Rules of Civil Procedure;

(b)     entering a judgment against the Shareholder Defendants, including against the Shareholder Class Representatives, individually and as representatives of the Shareholder Class, finding that the Shareholder Transfers constitute constructively fraudulent transfers;

(c)      avoiding the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(d)      granting recovery of all amounts paid to each of the Shareholder Defendants in connection with the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(e)      granting an attachment against the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(f)      imposing a constructive trust on the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(g)      granting an injunction against further disposition of the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(h)      levying execution on the Shareholder Transfers or their proceeds;

(i)      awarding Plaintiffs damages in an amount to be determined at trial;

(j)      awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

(k)      awarding Plaintiffs pre- and post-judgment interest at the highest applicable rate; and

(l)      granting such other and further relief as is just and proper.

Date: October 9, 2012

Respectfully submitted,

By _____
David M. Zensky
Mitchell P. Hurley
Deborah J. Newman
Jason L. Goldsmith
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
E-mail: *dzensky@akingump.com*

*Counsel for Plaintiffs*
DEUTSCHE BANK TRUST COMPANY AMERICAS, LAW DEBENTURE TRUST
COMPANY OF NEW YORK AND WILMINGTON TRUST COMPANY, except with respect
to claims asserted against Shareholder Defendants by FRIEDMAN KAPLAN SEILER &
ADELMAN LLP, KASOWITZ, BENSON, TORRES & FRIEDMAN LLP or ARONAUER, RE
& YUDELL, LLP

and

By_____
Robert J. Lack
Hal Neier
Amy C. Brown
Ricardo Solano Jr.
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250
E-mail: *rlack@fklaw.com*

*Counsel for Plaintiffs*
DEUTSCHE BANK TRUST COMPANY AMERICAS, LAW DEBENTURE TRUST
COMPANY OF NEW YORK AND WILMINGTON TRUST COMPANY, solely with respect
to claims asserted against Shareholder Defendants:  BELL ATLANTIC MASTER TRUST;
COMMERZ MARKETS LLC; DRESDNER BANK, AG; COMMERZBANK AG; CITI GOLDENTREE
LTD.; GOLDENTREE ASSET MANAGEMENT LP; GOLDENTREE MASTER FUND II LTD.;
GOLDENTREE MASTER FUND LTD.; GOLDENTREE MULTISTRATEGY OFFSHORE FUND;
GOLDENTREE MULTISTRATEGY LTD.; ROBECO INSTITUTIONAL ASSET MANAGEMENT
BV; ROBECO INVESTMENT MANAGEMENT, INC.; CITIGROUP SECURITIES SERVICES, INC.;
DRAWBRIDGE GLOBAL MACRO MASTER FUND LTD.; DREYFUS S&P 500 STOCK INDEX
FUND; STRATEGIC FUNDS, INC.; DREYFUS ACTIVE MIDCAP FUND; DREYFUS/LAUREL
FUNDS, INC.; DREYFUS BASIC S&P 500 STOCK INDEX FUND; DREYFUS INDEX FUNDS, INC.;
DREYFUS STOCK INDEX FUNDS, INC.; FLEXIBLE US EQUITY MANAGERS; PORTFOLIO 1
OFFSHORE MASTER LP LSV; FLEXIBLE US EQUITY MANAGERS PORTFOLIO 1 LLC;
HOMELAND INSURANCE COMPANY OF NEW YORK; LOEB ARBITRAGE MANAGEMENT LP;
MICHAEL LOEB; M&T BANK (F/K/A MANUFACTURERS & TRADERS TRUST CO.); MADISON
SQUARE LARGE-CAP ENHANCED INDEX FUND LP (F/K/A NYLIM LARGE-CAP ENHANCED
INDEX FUND LP A/K/A NYLIM–QS LARGE CAP ENHANCED FUND LP); PACIFIC SELECT;
PACIFIC SELECT FUND; FOLKSAMERICA REINSURANCE COMPANY; WHITE MOUNTAINS
RE BERMUDA LTD.; WHITE MOUNTAINS REINSURANCE COMPANY OF AMERICA;
CITADEL EQUITY FUND LTD.; DUNDEE LEEDS MANAGEMENT SERVICES (CAYMAN) LTD.;
CITADEL LLC (F/K/A CITADEL INVESTMENT GROUP LLC); NEUBERGER BERMAN, INC.;
NOMURA SECURITIES INTERNATIONAL, INC.; BLACKPORT CAPITAL FUND LTD.;
UNIVERSITY OF TORONTO MASTER TRUST; GOVERNING COUNCIL OF THE UNIVERSITY
OF TORONTO; LABRANCHE & CO. LLC; LABRANCHE STRUCTURED PRODUCTS LLC;
STICHTING PENSIOENFONDS ABP; STICHTING PENSIOENFONDS HOOGOVENS; STICHTING
PENSIOENFONDS OCE; STICHTING PENSIOENFONDS ZORG EN WELZIJN; GRYPHON
HIDDEN VALUES VIII LTD.; W. MILTON, JR. TRUST UNDER WILL FOR THE BENEFIT OF
ANNA LIVINGSTONE; M&T BANK, AS TRUSTEE OF THE W. MILTON, JR. TRUST UNDER
WILL FOR THE BENEFIT OF ANNA LIVINGSTONE; ANNA LIVINGSTONE; CITIGROUP
SECURITIES SERVICES, INC.; and MIZUHO TRUST & BANKING CO. (USA)

and

By _____
David S. Rosner
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Attorneys for PLAINTIFFS DEUTSCHE BANK TRUST COMPANY AMERICAS, LAW
DEBENTURE TRUST COMPANY OF NEW YORK, and WILMINGTON TRUST
COMPANY, with respect to claims asserted against Shareholder Defendants: QVT FUND LP;
and STICHTING PENSIOENFONDS VAN DE ABN AMRO N.V.

and

By _____

Joseph Aronauer
ARONAUER, RE & YUDELL, LLP
One Grand Central Place
60 East 42nd Street, Suite 1420
New York, NY 10165
Tel: (212) 755-6000
Fax: (212) 755-6006

Attorneys for Plaintiffs DEUTSCHE BANK TRUST COMPANY AMERICAS, LAW
DEBENTURE TRUST COMPANY OF NEW YORK, and WILMINGTON TRUST
COMPANY, with respect to claims asserted against Shareholder Defendants:  MITSUBISHI
UFJ ASSET MGMT #XX8364 (THROUGH MASTER TRUST BANK OF JAPAN) C/O
BANK OF TOKYO-MITSUBISHI UFJ TRUST COMPANY; MASTER TRUST BANK OF
JAPAN LTD.; BANK OF TOKYO-MITSUBISHI UFJ TRUST COMPANY; MITSUBISHI
UFJ ASSET MANAGEMENT LTD.; MITSUBISHI UFJ; ABN AMRO CLEARING
CHICAGO LLC (F/K/A FORTIS CLEARING AMERICAS LLC); and FORTIS CLEARING
AMERICAS LLC 695

# COMPLAINT
# EXHIBIT A

**NEW YORK**
**EXHIBIT A TO THE THIRD AMENDED COMPLAINT**

REDACTED

# COMPLAINT
# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| | Jointly Administered |
| Debtors. | D.I. 5591, 8201 |

**ORDER GRANTING (I) RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT THE AUTOMATIC STAY BARS COMMENCEMENT BY CREDITORS OF STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS AND (II) LEAVE FROM THE MEDIATION ORDER TO PERMIT COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS**

Upon the motion dated March 1, 2011 of Aurelius Capital Management, LP, on behalf of its managed entities (collectively "Aurelius"), Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company ("Deutsche Bank"), and Law Debenture Trust Company of New York, in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

its capacity as successor indenture trustee for certain series of senior notes issued by Tribune Company ("Law Debenture" and, collectively with Aurelius, Deutsche Bank and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES notes issued by Tribune Company, the "Original Plaintiff Group"), for entry of an order (I) determining that creditors have regained their state law constructive fraudulent conveyance claims to recover stock redemption payments made to Step One Shareholders (as defined below) and Step Two Shareholders (as defined below) due to the expiration of the statute of limitations under 11 U.S.C. § 546(a); (II) determining that the automatic stay does not bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in the alternative, granting relief from the automatic stay to permit the commencement of such litigation; and (III) granting leave from this Court's Order Appointing Mediator [*ECF No.* 5591] (the "Mediation Order") to permit the commencement of such litigation (the "Motion"); and it appearing that good and sufficient notice of the Motion was given and that no other or further notice is necessary; and the Court having considered the Motion at a hearing on March 22, 2011 (the "Hearing"); and the Court having overruled the objections to the Motion for the reasons stated at the Hearing; and after due deliberation and it appearing sufficient cause exists for granting the requested relief, it is therefore

ORDERED, ADJUDGED AND DECREED that:

1. The Motion is GRANTED to the extent set forth herein.

2. Because no state law constructive fraudulent conveyance claims against shareholders whose stock was redeemed or purchased in connection with the first step (such shareholders, the "Step One Shareholders") and/or the second step (such shareholders, the "Step Two Shareholders") of the 2007 leveraged buy-out of Tribune Company (the "LBO") were commenced by or on behalf of the Debtors' estates before the expiration of the applicable statute

of limitations under 11 U.S.C. § 546(a), the Debtors' creditors have regained the right, if any, to prosecute their respective state law constructive fraudulent conveyance claims against Step One Shareholders and/or Step Two Shareholders to recover stock redemption/purchase payments made to such shareholders in connection with the LBO (collectively, the "Creditor SLCFC Claims").

3.      To the extent the automatic stay of 11 U.S.C. § 362(a) stays the commencement of any Creditor SLCFC Claims, the automatic stay is hereby lifted to permit the filing of any complaint by or on behalf of creditors on account of such Creditor SLCFC Claims, including, without limitation, any complaint filed by any plaintiff in the Original Plaintiff Group.

4.      To the extent the Mediation Order stays the commencement of any Creditor SLCFC Claims, leave is hereby granted from such Mediation Order to permit the filing of the complaint(s) referenced in paragraph 3 above.

5.      To the extent that a creditor other than a member of the Original Plaintiff Group seeks to file its own complaint with respect to its Creditor SLCFC Claims, such creditor shall file a statement in this Court acknowledging that the creditor shall, except as provided in and in accordance with paragraph 6 below, stay all actions in the state court litigation and will otherwise adhere to the terms of this Order.

6.      Absent further order of this Court, litigation commenced by the filing of any complaint referenced in paragraphs 3 and 5 above shall automatically be stayed in the applicable state court(s) where such complaint(s) are filed, or if not automatic in such state court(s), then application for the stay in accordance with the provisions of this Order shall be made by the Original Plaintiff Group or any other creditor that files its own complaint; provided, however, that during such stay, any party, including any plaintiff in the Original Plaintiff Group, that files such a complaint may: (a) consistent with governing rules, amend such complaint; (b) complete

service of such complaint; and (c) take such steps, including immediately pursuing discovery, as are necessary solely for the purpose of preventing applicable statutes of limitations or other time-related defenses from barring any Creditor SLCFC Claims.

7.      Nothing in this Order shall prejudice the rights of the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") or any trust established under any plan of reorganization that is confirmed in the Debtors' chapter 11 cases, including to, as the case may be, (i) pursue whatever claims are properly asserted by the Creditors' Committee or by such trusts, in any proper venue, or (ii) amend in any way the adversary complaints (Adv. Pro. Nos. 10-53963 and 10-54010) filed by the Creditors' Committee in these chapter 11 cases, or take or seek to take any other action, or assert any rights or arguments, in connection with such claims or complaints.

8.      Nothing in this Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a Creditor SLCFC Claim or any objection to any plan of reorganization currently before this Court.[2]

9.      This Court shall, except with respect to the prosecution of the Creditor SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated:      April 25      , 2011
        Wilmington, Delaware

HONORABLE KEVIN J. CAREY
Chief United States Bankruptcy Judge

cc: William P. Bowden, Esquire[3]

---

[2] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. § 546(e).

[3] Counsel shall serve a copy of this Order on all interested parties and file a Certificate of Service with this Court.

**COMPLAINT
EXHIBIT C**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | ) | Case No. 08-13141 (KJC) |
| | ) | Jointly Administered |
| Debtors. | ) | Re: Docket Nos. 9248, 9293, 9335 |
| | ) | |

## ORDER GRANTING MOTION BY DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES, TO CLARIFY, SUPPLEMENT OR MODIFY THIS COURT'S ORDER ENTERED APRIL 25, 2011 (ECF 8740) AND CROSS-MOTION OF CERTAIN STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE DEFENDANTS IN RESPECT OF STATE LAWCONSTRUCTIVE FRAUDULENT CONVEYANCE SUITS

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WCCT Inc., f/k/a WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Upon consideration of the motion (the "Motion")[2] dated June 14, 2011 of Deutsche Bank

Trust Company Americas, in its capacity as successor indenture trustee for certain series of

senior notes issued by Tribune Company, Law Debenture Trust Company of New York, in its

capacity as successor indenture trustee for certain series of senior notes issued by Tribune

Company, and Wilmington Trust Company, in its capacity as successor indenture trustee for the

PHONES notes issued by Tribune Company (collectively, the "Movants"), for entry of an order

clarifying, supplementing, or modifying the Court's *Order Granting (I) Relief From the

Automatic Stay to the Extent the Automatic Stay Bars Commencement By Creditors of State Law

Constructive Fraudulent Conveyance Claims to Recover Stock Redemption Payments Made to

Step One Shareholders and Step Two Shareholders and (II) Leave From the Mediation Order to

Permit Commencement of Litigation on Account of Such Claims*, dated April 25, 2011 [Dkt.

8740] (the "SLCFC Claims Order") to confirm that neither the automatic stay of Bankruptcy

Code section 362 nor the provisions of the SLCFC Claims Order prevent the Movants from (i)

moving to consolidate and/or coordinate the state law constructive fraudulent conveyance actions

commenced by the Movants, including, without limitation, by moving to consolidate them into

one MDL proceeding pursuant to 28 U.S.C. § 1407 and (ii) in the event that any one or more

SLCFC Courts or parties other than the Movants do not agree to stay the litigation of the state

law constructive fraudulent conveyance actions commenced by the Movants, taking appropriate

action to enforce the stay in the first instance and filing all appropriate responses in connection

with any motions, pleadings, or orders filed in such actions that were not so stayed; and upon the

responses to the Motion filed by certain retirees (the "Retiree Plaintiffs") of the Debtors who

commenced four separate state law constructive fraudulent conveyance actions; and upon

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

consideration of the cross-motion (the "Cross-Motion") dated June 21, 2011 of JPMorgan

Securities LLC, JPMorgan Clearing Corp., JPMorgan Chase Bank, N.A., Citicorp North

America, Inc., Citigroup Global Markets Inc., Merrill Lynch Capital Corporation, Merrill Lynch,

Pierce, Fenner & Smith Incorporated, Merrill Lynch & Co. Inc. and their affiliates,  Bank of

America, N.A. and Banc of America Securities LLC, for entry of an order to clarify, supplement

or modify this Court's SLCFC Claims Order to permit defendants in any litigation concerning

the SLCFC Claims (hereinafter, the "SLCFC Actions") to seek to remove those suits to federal

court; and it appearing that good and sufficient notice of the Motion and Cross-Motion was given

and that no other or further notice is necessary; and the Court having considered the Motion and

the Cross-Motion at a hearing on June 28, 2011 (the "Hearing"); and all objections having been

resolved; and after due deliberation and it appearing sufficient cause exists for granting the

requested relief, it is therefore

     ORDERED, ADJUDGED AND DECREED that:

     1.     The Motion and the Cross-Motion are GRANTED to the extent set forth herein.

     2.     The SLCFC Claims Order is hereby supplemented to provide that (a) any plaintiff

or defendant in the SLCFC Actions is authorized to move to consolidate and/or coordinate the

SLCFC Actions, including, without limitation, by making a motion pursuant to 28 U.S.C. § 1407

and the applicable Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation (the

"JPML Rules"), or any applicable state rules, or to move to amend or respond to such a motion;

(b) any defendant in the SLCFC Actions commenced in state court may seek to remove those

actions on any applicable ground; and (c) any party opposing such removal may file a timely

motion to remand and any party may respond to any such motion.

3.      Further, in the event that any one or more courts or parties in the SLCFC Actions do not agree to stay the litigation of the SLCFC Actions, any plaintiff or defendant in the SLCFC Actions is authorized to take all appropriate actions to enforce the stay in the first instance and to file all appropriate responses in connection with any motions, pleadings or orders filed in the SLCFC Actions that were not so stayed.

4.      Nothing in the Order shall prejudice or impair any claims or defenses of any defendant in any proceeding in respect of a SLCFC Claim or any objection to any plan of reorganization currently before this Court.[3]

5.      This Court shall, except with respect to the prosecution of the SLCFC Claims, retain exclusive jurisdiction to hear and decide any and all disputes relating to or arising from this Order.

Dated: _____, 2011
           Wilmington, Delaware


_____
HONORABLE KEVIN J. CAREY
Chief United States Bankruptcy Judge

---

[3] For the avoidance of doubt, by this Order, this Court makes no finding and issues no ruling determining the standing of the Original Plaintiff's Group (or any creditor) to assert the Creditor SLCFC Claims or whether such claims are preempted or otherwise impacted by 11 U.S.C. §546(e).